13-3790-cv
*Concerned Home Care Providers, Inc. v. Cuomo*

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

August Term 2014

(Argued: August 20, 2014          Decided: March 27, 2015)

No. 13-3790-cv

_____

CONCERNED HOME CARE PROVIDERS, INC., AMERICAN CHORE SERVICES, INC., DBA CITY CHOICE HOME CARE SERVICES, COMMUNITY HOME CARE REFERRAL SERVICE, INC., EAGLE HOME CARE, LLC, PELLA CARE, LLC, AND PLATINUM HOME HEALTH CARE, INC.,
*Plaintiffs-Appellants*,

ST. MARY'S HEALTHCARE SYSTEM FOR CHILDREN,
*Plaintiff*,

-v.-

ANDREW M. CUOMO, AND NIRAV R. SHAH,
*Defendants-Appellees*.

_____

Before:      WALKER, WESLEY, and LIVINGSTON, *Circuit Judges*.

Plaintiffs appeal from a judgment of the United States District Court for the Northern District of New York (Mordue, *J.*), entered on September 25, 2013. Plaintiffs sought to enjoin Defendants Andrew M. Cuomo and Nirav R. Shah from enforcing the New York Wage Parity Law, N.Y. Pub. Health Law § 3614-c, on the grounds that it is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, or the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, or is unconstitutional under the Due Process and

Equal Protection Clauses of the Fourteenth Amendment. The district court granted Defendants' motion to dismiss in part, denied it in part, and entered final judgment, deciding that ERISA preempts subdivision four of the Wage Parity Law but that the remainder of the statute is neither preempted nor unconstitutional. Setting aside subdivision four (which is not before us) we conclude that the Wage Parity Law is not preempted by ERISA. In addition, the Law as a whole is not preempted by the NLRA, and does not violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Accordingly, the judgment of the district court is **AFFIRMED**.

PHILIP E. ROSENBERG, Nixon Peabody LLP, Albany, NY; Benjamin F. Neidl, Wilson Elser Moskowitz Edelman & Dicker LLP, Albany, NY, *for Plaintiffs-Appellants*.

JEFFREY W. LANG, Assistant Solicitor General, Andrew D. Bing, Deputy Solicitor General, Barbara D. Underwood, Solicitor General, *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees.*

David M. Slutsky, Levy Ratner, P.C., New York, NY, *for Amicus Curiae 1199 SEIU United Healthcare Workers East in support of Defendants-Appellees.*

DEBRA ANN LIVINGSTON:

A section of the New York Public Health Law known as the "Wage Parity Law" sets the minimum amount of total compensation that employers must pay home care aides in order to receive Medicaid reimbursements for reimbursable care provided in New York City and Westchester, Suffolk, and Nassau Counties (the

2

"surrounding Counties"). N.Y. Pub. Health Law § 3614-c. The questions presented on appeal are whether the Wage Parity Law is preempted by the National Labor Relations Act ("NLRA"), or the Employee Retirement Income Security Act of 1974 ("ERISA"), or is unconstitutional under the Fourteenth Amendment's Due Process and Equal Protection Clauses. We conclude that the Wage Parity Law is neither preempted nor unconstitutional, and we therefore affirm the judgment of the district court.[1]

## BACKGROUND

### A. The Wage Parity Law

"[T]he provision of high quality home care services to residents of New York state is a priority concern" of the New York Legislature. N.Y. Pub. Health Law § 3600. To that end, the State's Public Health Law establishes a procedure for licensing "home care services agencies" ("LHCSAs"), which employ home care aides. *Id.* § 3605. Home care aides fall into two main categories: "home health" aides ("HHAs") and "personal care" aides ("PCAs"). *See id.*; *see also id.* § 3614-

---

[1] As set forth herein, the district concluded that subdivision four of the Wage Parity Law is preempted by ERISA. That judgment is not before us. As to the present ERISA preemption claim, we conclude that the Wage Parity Law, excepting subdivision four, is not preempted.

3

c(1)(d). Both are qualified to assist patients in daily activities like maintaining personal hygiene and completing household tasks. *See id.* § 3602(4)-(5). But HHAs must undergo more extensive training than PCAs, which allows them to perform "other related supportive services essential to the patient's health." 10 N.Y. Code Rules & Regs. § 700.2(c)(15); *see also id.* § 700.2(b)(9), (14).

Notwithstanding the additional training, by 2010, HHAs in New York City and the surrounding Counties received a lower starting hourly wage than PCAs. *See* Carol Rodat, *New York's Home Care Aide Workforce: A Framing Paper* 17 (2010) *available at* http://www.phinational.org/sites/phinational.org/files/clearinghouse/ PHI-486%20NY%20Framing.pdf. Known as "wage inversion," this pay gap arose because many PCAs serve LHCSAs contracting directly with New York City and therefore benefit from the City's Living Wage Law, and because PCAs unionized in greater numbers than HHAs. *Id.* at 18. A committee created by Governor Andrew Cuomo to recommend changes to New York's Medicaid program proposed that LHCSAs and other home care aide employers should be required to compensate all of their employees at a level commensurate with local living wage laws in order to receive Medicaid reimbursements. *See* New York State Department of Health, *Proposals Approved by the NYS Medicaid Redesign Team Feb. 24, 2011, available at*

4

http://www.health.ny.gov/health_care/medicaid/redesign/ docs/approved_proposals.pdf (last visited Feb. 3, 2015). Although ultimately not endorsed by the full committee, the proposal was "intended to address the inconsistency in wages among home care workers" and thereby improve the recruitment and retention of high-quality home care aides. *See* New York State Department of Health, Proposal Number 61, *Proposals Being Rated*, *available at* http://www.health.ny.gov/health_care/medicaid/redesign /docs/proposals_being_rated.pdf (last visited Feb. 3, 2015).

In 2011, the New York Legislature enacted the "Wage Parity Law" as part of a Medicaid reform package. N.Y. Pub. Health Law § 3614-c. This addition to the New York Public Health Law requires LHCSAs and other employers in New York City and the surrounding Counties to pay all home care aides providing Medicaid-covered care an "applicable minimum rate of home care aide total compensation" in order to receive Medicaid reimbursements for that care. *Id.* § 3614-c(2); *see also id.* § 3614-c(1)(d) (defining "[h]ome care aide" to include "home health aide[s]" and "personal care aide[s]"). "Total compensation" consists of "all wages and other direct compensation paid to or provided on behalf of the employee," including

"health, education or pension benefits, supplements in lieu of benefits and compensated time off." *Id.* § 3614-c(1)(b).

Subdivision three of the Wage Parity Law establishes two "applicable minimum rate[s] of home care aide total compensation" — one for care furnished in New York City,[2] and the other for care furnished in the surrounding Counties. Each "applicable minimum rate" increases gradually over the course of three or four years. In New York City, employers must pay home care aides at least ninety percent of the rate mandated by the City's Living Wage Law for services performed between March 2012 and February 2013. *Id.* § 3614-c(3)(a)(i). That proportion increases to ninety-five percent for services furnished between March 2013 and February 2014. *Id.* § 3614-c(3)(a)(ii). From March 2014 onward, employers must pay the *greater* of the rate set by the City's Living Wage Law or the "prevailing rate of total compensation as of January [1, 2011]," *id.* § 3614-c(3)(a)(iii). The "[p]revailing rate of total compensation" is the "average hourly amount of total compensation paid to all home care aides covered by whatever collectively bargained agreement covers the greatest number of home care aides in [New York City]." *Id.* § 3614-

---

[2] The Wage Parity Law refers to cities "with a population of one million or more" instead of New York City, but New York City is the only city that meets that population threshold.

c(1)(c). On January 1, 2011, the collective bargaining agreement that covered the greatest number of home care aides in New York City was the agreement negotiated by Service Employees International Union ("SEIU") Local 1199. The Wage Parity Law thus references SEIU 1199's collective bargaining agreement as of January 1, 2011 to define the "prevailing rate of total compensation," but does not reference any subsequent changes to that agreement. *Id.* § 3614-c(3)(a)(iii).

The "applicable minimum rate of home care aide total compensation" for services furnished in the surrounding Counties follows a different schedule. *Id.* § 3614-c(3)(b). Beginning in March 2013, employers must pay home care aides in the surrounding Counties at least ninety percent of the rate set by New York City's Living Wage Law. *Id.* § 3614-c(3)(b)(i). That rate continues until March 2014, when it rises to ninety-five percent of the New York City Living Wage rate. *Id.* § 3614-c(3)(b)(ii). The statute then requires two additional increases: first to one-hundred percent of the New York City Living Wage rate in March 2015, *id.* § 3614-c(3)(b)(iii), and then, in March 2016, to the *lesser* of one hundred-fifteen percent of the rate set by the New York City Living Wage Law or the living wage law of the county in which the care is provided, *id.* § 3614-c(3)(b)(iv).

Subdivision four of the Wage Parity Law, in relevant part, provides that "[a]ny portion of the minimum rate of home care aide total compensation attributable to health benefit costs or payments in lieu of health benefits, and paid time off, . . . shall be superseded by the terms of any employer bona fide collective bargaining agreement in effect as of January [1, 2011], or a successor to such agreement, which provides for home care aides' health benefits through payments to jointly administered labor-management funds." *Id.* § 3614-c(4). A "jointly administered labor-management fund" is also known as a "Taft-Hartley" plan. As the district court noted, it is undisputed that by incorporating New York City's living wage rate, the "total compensation" referred to in subdivision four includes a specific hourly amount attributed to health benefit costs ($1.35 at the time of the district court's opinion). *Concerned Home Care Providers v. Cuomo*, 979 F. Supp. 2d 288, 300 (N.D.N.Y. 2013). Subdivision four thus provides that, for the purposes of the Wage Parity Law, any portion of the "minimum rate of home care aide total compensation" attributable to such benefits or wage supplements will be superceded in the case of an applicable Taft-Hartley plan by its relevant terms, and such employers can accordingly compensate their home care aides at a rate below the minimum prescribed in the Wage Parity Law.

8

## B. Procedural History

Plaintiffs-Appellants are five LHCSAs and a not-for-profit trade association of home care agencies ("Plaintiffs"). They filed suit on February 28, 2012 in the United States District Court for the Northern District of New York (Mordue, *J.*), seeking to prevent Defendant-Appellee Nirav R. Shah, the Commissioner of the New York State Department of Health, from enforcing the Wage Parity Law.[3] The complaint alleges that the Law is either preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, or the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, or is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[4]

Defendants moved to dismiss the complaint and, on September 25, 2013, the district court granted the motion in part, denied it in part, and entered final judgment. *See Concerned Home Care Providers*, 979 F. Supp. 2d at 312. The court

---

[3] Plaintiffs also named Governor Andrew M. Cuomo as a defendant, but the district court concluded that he is not a proper party and dismissed all claims against him. Plaintiffs have not appealed that decision.

[4] In tandem with their federal action, Plaintiffs filed suit in the New York Supreme Court for Albany County, arguing that the Wage Parity Law violates the New York Constitution. The Supreme Court granted summary judgment for Defendants, and the Third Department of the New York Appellate Division affirmed. *See Concerned Home Care Providers, Inc. v. New York*, 969 N.Y.S.2d 210 (3d Dep't 2013).

concluded that the NLRA does not preempt the Wage Parity Law, and that the Law does not violate Plaintiffs' Fourteenth Amendment rights. *See id.* at 305-10. However, the court determined that subdivision four — which excuses grandfathered collective bargaining agreements that include Taft-Hartley plans from complying with certain aspects of the Wage Parity Law — runs afoul of ERISA's express preemption provision because it "'singles out' . . . only one type of ERISA plan" for unique treatment. *Id.* at 302 (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 830 (1988)). The court then turned to the severability provisions enacted contemporaneously with the Wage Parity Law, as well as those in the Public Health Law, and decided that subdivision four could be excised from the Wage Parity Law. *See id.* at 311-12. Because Plaintiffs did not argue that ERISA preempts other portions of the Law, and because the parties did not request discovery, the district court granted Plaintiffs' requested relief as to subdivision four, dismissed the remainder of their claims, and entered final judgment. *See id.* at 312-13.

# DISCUSSION

Plaintiffs now ask this Court to decide whether the Wage Parity Law is preempted by the NLRA or ERISA, or violates their Fourteenth Amendment rights.[5] We review the district court's dismissal of their claim *de novo*, accepting the complaint's factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor. *Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014). We conclude that neither the NLRA nor ERISA (excepting subdivision four) preempts the Wage Parity Law and that the Law does not violate Plaintiffs' constitutional rights. The judgment of the district court is therefore affirmed.[6]

---

[5] Defendants have not appealed the district court's decision that ERISA preempts subdivision four of the Wage Parity Law. Nor have they asserted waiver with regard to Plaintiffs' ERISA preemption challenge with regard to the rest of the Law. We conclude that Plaintiffs' ERISA preemption challenge to the balance of the Wage Parity Law, which presents a pure question of law, is properly before us. *See Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004) (per curiam).

[6] Defendants argue that Plaintiffs' claims are barred by res judicata and collateral estoppel. We have doubts about whether Defendants properly presented this argument in the district court, because they raised the issue in a letter submitted after their motion to dismiss and did not seek leave to amend that motion. *See O'Connor v. Pierson*, 426 F.3d 187, 194-95 (2d Cir. 2005). Since we rule for Defendants on the merits, we need not, and do not, resolve their preclusion arguments.

## A. NLRA Preemption

The NLRA does not contain an express preemption provision. Instead, "[t]he doctrine of labor law pre-emption concerns the extent to which Congress has placed *implicit* limits on the permissible scope of state regulation of activity touching upon labor-management relations." *N.Y. Tel. Co. v. N.Y. Dep't of Labor*, 440 U.S. 519, 527 (1979) (emphasis added and internal quotation marks omitted).

One form of implied preemption under the NLRA, known as *Machinists* preemption, forbids states and localities from intruding upon "the [labor-management] bargaining process." *Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 149 (1976). This doctrine "rel[ies] on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated, and how much it should be left unregulated." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 751 (1985). Sections 7 and 8 of the NLRA guarantee employees the right to organize and engage in other forms of protected concerted action, and identify forms of unfair labor practices. 29 U.S.C. §§ 157, 158(a)-(b). The remaining aspects of the bargaining process are left "to be controlled by the free play of economic forces." *Machinists*,

12

427 U.S. at 140 (internal quotation marks omitted).  For a state to "define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining" is therefore "denying one party to an economic contest a weapon that Congress meant him to have available."  *Id.* at 150 (internal quotation marks omitted).

As the Supreme Court made clear in *Metropolitan Life*, "[t]he framework established in the NLRA was merely a means to allow the parties to reach . . . agreement fairly."  471 U.S. at 752; *see* 29 U.S.C. § 151.  The statute's concern with "establishing an equitable *process* for determining terms and conditions of employment" does not extend to the "particular *substantive terms* of the bargain that is struck."  *Metro. Life*, 471 U.S. at 753 (emphasis added) (citing Archibald Cox, *Recent Developments in Federal Labor Law Preemption*, 41 Ohio St. L.J. 277, 297 (1980)).

In contrast to their inability to regulate the bargaining process, states have traditionally possessed "broad authority under their police powers to regulate the employment relationship," and the substantive labor standards that they enact set a baseline for employment negotiations. *DeCanas v. Bica*, 424 U.S. 351, 356 (1976); *see also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) ("[P]re-emption should not be lightly inferred . . . , since the establishment of labor standards falls within the

13

traditional police power of the State."). Such "[m]inimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective bargaining processes that are the subject of the NLRA." *Metro. Life*, 471 U.S. at 755. Instead, they simply "give specific minimum protections to *individual* workers." *Id.*

The Wage Parity Law is a valid exercise of New York's authority to set minimum labor standards. States have traditionally sought to remedy the problem of depressed wages by regulating payment rates, and those efforts are "not incompatible" with the "general goals of the NLRA." *Id.* at 754-55. The Wage Parity Law, which stabilizes minimum wages for the hundreds of thousands of home care aides in New York City and the surrounding Counties, is an unexceptional exercise of that traditional power. "Unlike the NLRA," the Law is not "designed to encourage or discourage employees in the promotion of their interests collectively." *Id.* at 755. All home care aides in New York City and the surrounding Counties benefit from the statute's minimum rate of compensation — it neither distinguishes between unionized and non-unionized aides, nor treats employers differently based

14

on whether they employ unionized workers.[7] By applying only to Medicaid-reimbursed care, moreover, the Wage Parity Law is limited to funds over which Congress has granted the state a special "measure of discretion" to craft "programs that are responsive to the needs of [its] communities." *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 134-35 (2d Cir. 2014); *see also Metro. Life*, 471 U.S. at 749 n.27 ("An appreciation of the State's interest in regulating a certain kind of conduct may still be relevant in determining whether Congress in fact intended the conduct to be unregulated.").

Although fixing a minimum rate of compensation restricts the terms over which employers and employees may negotiate, "the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption." *Fort Halifax*, 482 U.S. at 21. After all, these parties traditionally "come to the bargaining table with rights under state law that form a backdrop for their negotiations." *Id.* (internal quotation marks omitted). For that reason, in *Rondout Electric, Inc. v. New York Department of Labor*, 335 F.3d 162 (2d Cir. 2003), we

---

[7] By singling out Taft-Hartley plans, subdivision four arguably treats union and non-union employees differently. But the district court enjoined enforcement of that section and severed it from the remainder of the statute. Defendants did not appeal that order. The remainder of the Wage Parity Law treats union and non-union employees the same.

upheld a regulation implementing § 220 of the New York Labor Law, which requires employers on public works projects to pay employees an amount equal to the "prevailing rate of similarly employed workers in the locality," either in the form of benefits or wages. *Id.* at 164 (internal quotation marks omitted). Although setting a minimum wage indirectly affects how employers and employees bargain, we concluded that the law is not preempted under the *Machinists* doctrine because it does not favor or disfavor collective bargaining, "eliminate particular bargaining tools," or dictate the details of particular contract negotiations. *Id.* at 169.

The Wage Parity Law's mandate that home care aides be paid a minimum rate of total compensation is no different. By setting a total compensation floor, the Law may affect the package of benefits over which employers and employees can negotiate, but "it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not preempted by that Act." *Metro. Life*, 471 U.S. at 758.

Plaintiffs contend that the Wage Parity Law is unique because it applies only to home care aides in New York City and the surrounding Counties. *Machinists* preemption does not, however, eliminate state authority to craft minimum labor standards for particular regions or areas of the labor market. For instance, § 220 of

16

the New York Labor Law, which we addressed in *Rondout*, applies only to employees on public works projects and sets the minimum wage based on the "prevailing [compensation] rate . . . in the *locality*." *Rondout*, 335 F.3d at 164 (internal quotation marks omitted) (emphasis added). Other Circuits have also upheld local ordinances establishing substantive worker protections in particular industries. *See, e.g.*, *R.I. Hospitality Ass'n v. City of Providence*, 667 F.3d 17, 32-33 (1st Cir. 2011) (upholding local regulation that requires new hospitality employers to retain employees); *Wash. Serv. Contractors Coal. v. Dist. of Columbia*, 54 F.3d 811, 817-18 (D.C. Cir. 1995) (upholding local regulation that applies to employees performing food, janitorial, maintenance, or nonprofessional health care services). And the Supreme Court has never applied *Machinists* preemption to a state law that does not regulate the mechanics of labor dispute resolution. *Compare, e.g.*, *Fort Halifax*, 482 U.S. at 19-22 (upholding severance law that applies only to businesses with 100 or more employees), *with Machinists*, 427 U.S. at 140 (striking down state law that penalized concerted refusals to work overtime). Even assuming, *arguendo*, that there may be labor standards that are so finely targeted that they impermissibly intrude

17

upon the collective-bargaining process,[8] the Wage Parity Law, which simply sets a minimum rate of compensation for the hundreds of thousands of home care aides who provide Medicaid-covered care in New York City and the surrounding Counties, is no such law.

Plaintiffs also raise two objections to the mechanisms by which the Wage Parity Law calculates the "minimum rate of home care aide total compensation." Neither argument alters our conclusion. First, Plaintiffs contend that, because the minimum rate of total compensation is pegged to New York City's Living Wage

---

[8] Plaintiffs' reliance on *Chamber of Commerce v. Bragdon*, 64 F.3d 497 (9th Cir. 1995), and *520 South Michigan Avenue Associates v. Shannon*, 549 F.3d 1119 (7th Cir. 2008), is misplaced. Even assuming, *arguendo*, that these cases were correctly decided, they are readily distinguishable. The ordinance in *Bragdon* not only prescribed a particular level of total compensation, but also dictated "the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits for the worker" — a "much more invasive and detailed" interference with the collective-bargaining process than the Wage Parity Law's minimum total compensation requirement. 64 F.3d at 502. And unlike the ordinance in *Bragdon*, which applied to all *private* industrial construction, the Wage Parity Law applies only to Medicaid-reimbursed care. *See Rondout*, 335 F.3d at 169; *see also Associated Builders & Contractors of S. Cal., Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004). As for *Shannon*, the law at issue in that decision "establish[ed] terms of employment that would be very difficult for any union to bargain for," including detailed break requirements and changes to the burden of proof and to damages calculations in retaliation lawsuits. 549 F.3d at 1134. Such provisions represent a substantially more targeted invasion of the bargaining process than the Wage Parity Law's minimum compensation requirement. Moreover, by switching the burden of proof in retaliation cases, the ordinance in *Shannon* arguably interfered with both the NLRB's jurisdiction and the parties' grievance and arbitration procedures. In this way, the ordinance went beyond prescribing minimum labor standards and arguably interfered with the collective-bargaining process. *See Metro. Life*, 471 U.S. at 753.

Law, employees can lobby the City government for higher wages. But the ability to lobby is present "with regard to any state law that substantively regulates employment conditions." *Fort Halifax*, 482 U.S. at 21. *Machinists* preemption is not a license for courts to close political routes to workplace protections simply because those protections may also be the subject of collective bargaining. *Id.* at 21-22.

The second objection — that calculating the "prevailing rate of total compensation" based on the largest collective bargaining agreement covering home care aides in New York City reduces incentives to bargain in the future — is similarly unpersuasive. The Wage Parity Law uses the "prevailing rate of total compensation *as of January [1, 2011]*," and that prevailing rate cannot be used to set the minimum rate of total compensation until March 2014 at the earliest. N.Y. Pub. Health Law § 3614-c(3)(a)(iii) (emphasis added). Any changes to the largest collective bargaining agreement that might occur *after* January 1, 2011 have no effect on the rate mandated by the Wage Parity Law. Unions, individual employees, and employers therefore remain free to bargain about how to allocate total compensation between wages and other benefits and whether a compensation rate above the January 1, 2011 level is appropriate. The Wage Parity Law's use of the largest collective bargaining agreement to set the "prevailing rate of total compensation"

19

has no more of an effect on incentives to bargain collectively than if the Legislature wrote a rate directly into the statute.

The district court correctly decided that the NLRA does not preempt the Wage Parity Law. Because we uphold the Law as a minimum labor standard, we need not, and do not, address Defendants' argument that the Law can also be upheld on the ground that the State's actions are proprietary, rather than regulatory.

## B. ERISA Preemption

Before the district court, Plaintiffs argued that ERISA preempts the Wage Parity Law because subdivision four singles out Taft-Hartley plans for special treatment. The district court agreed (and Defendants did not appeal that ruling), but severed subdivision four from the statute rather than invalidating the entire Law. *See Concerned Home Care Providers*, 979 F. Supp. 2d at 311-12. Plaintiffs now urge us to find the remainder of the Wage Parity Law preempted, either because subdivision four is not severable or because ERISA separately preempts the Law's other provisions. We disagree with both arguments.

To begin with, the district court was correct to sever subdivision four from the Wage Parity Law. Severability is a question of state law and, in New York, turns on "whether the Legislature would have wished the statute to be enforced with the

20

invalid part exscinded, or rejected altogether." *Greater N.Y. Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 110 (2d Cir. 1999) (internal quotation marks omitted). Here, the New York Legislature's intent is clear. The Wage Parity Law was enacted in Part H of chapter 59 of the 2011 Session Laws of New York State. Section 110 of that same Part states that, if any subdivision of the act "shall be adjudged" invalid, the judgment "shall not . . . invalidate the remainder thereof, but shall be confined in its operation to the . . . subdivision . . . directly involved." By severing subdivision four, the district court properly followed this clear statutory command. Moreover, we agree with the district court that, without subdivision four, the Wage Parity Law will still accomplish the legislative purpose of aligning home care aide compensation in the New York City metropolitan area.

With subdivision four severed, ERISA does not preempt the remainder of the Wage Parity Law. Unlike the NLRA, ERISA contains an express provision that preempts "any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). The Supreme Court has fashioned this expansive language into a test: "a state law is preempted if 'it (1) has a connection with or (2) reference to [an ERISA] plan.'" *Liberty Mut. Ins. Co.*

21

*v. Donegan*, 746 F.3d 497, 504 (2d Cir. 2014) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)) (emphasis omitted).

The language of ERISA's preemption clause is broadly worded. Nonetheless, the Supreme Court has cautioned against preempting "state action in fields of traditional state regulation," and has assumed "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (internal quotation marks omitted). ERISA is designed to regulate employee welfare and pension benefit plans. It does this not by "requiring employers to provide any given set of minimum benefits," but instead by "control[ling] the administration of benefits plans" through "reporting and disclosure mandates." *Id.* at 651. As a result, while its preemption provision "sweep[s] more broadly than state laws dealing with . . . reporting, disclosure, fiduciary responsibility, and the like," its "basic thrust . . . [is] to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Id.* at 657, 661 (internal quotation marks omitted); *see also Liberty Mut.*, 746 F.3d at 506-07. The statute does not preempt state laws that have "only an

22

indirect economic effect on ERISA plans." *Liberty Mut.*, 746 F.3d at 507 (internal quotation marks omitted).

Plaintiffs first contend that the Wage Parity Law has a "connection with" ERISA plans because employers will have to reevaluate, and possibly enhance, their benefits packages in order to pay employees the "applicable minimum rate of home care aide total compensation." Both the Supreme Court and this Court have held that such an indirect effect on ERISA plans does not trigger preemption. Instead, only statutes that "mandate[] employee benefit structures or their administration" have impermissible "connection[s] with" ERISA plans. *Travelers*, 514 U.S. at 658; *see also Cal. Div. of Labor Standards Enf. v. Dillingham Constr., N.A.*, 519 U.S. 316, 328 (1997). The Supreme Court has, for instance, upheld state laws that require payment of a prevailing wage to certain apprentices on public works projects, *see Dillingham*, 519 U.S. at 319, and that impose surcharges on hospital bills for patients not covered by Blue Cross/Blue Shield plans, *Travelers*, 514 U.S. at 649. Both laws have an "indirect economic influence" on how plan administrators structure plans, but do not "bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." *Dillingham*, 519 U.S. at 329-31; *see also Travelers*, 514 U.S. at 659-60.

23

We rejected an ERISA preemption challenge to § 220 of the New York Labor Law for similar reasons in *Burgio & Campofelice, Inc. v. New York Department of Labor*, 107 F.3d 1000 (2d Cir. 1997). Section 220 requires employers on public works projects to pay employees a "prevailing rate" of compensation. *Id.* at 1003. The prevailing rate must equal the combined value of wages and benefits guaranteed to workers on private projects through "collective bargaining agreements" that cover "workers in the same trade or occupation in the locality where the work is to be performed." *Id.* (citing N.Y. Lab. Law § 220(5)(a), (3)). In upholding the law, we observed that the statute may require employers to change their compensation packages to comply with the prevailing rate requirement, but that it permits them to do so "exclusively through ERISA plans, exclusively through non-ERISA plans, through additional cash wages, or through some combination of the three." *Id.* at 1009. Because the law leaves administrators free to comply through means unconnected to ERISA plans, we concluded that it lacked a sufficient "connection with" such plans to require preemption. *Id.*; *accord WSB Elec., Inc. v. Curry*, 88 F.3d 788, 796 (9th Cir. 1996); *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 958 (3d Cir. 1994).

24

The Wage Parity Law gives employers similar freedom to select the manner in which they pay the "minimum rate of home care aide total compensation." Under the Law, "[t]otal compensation" may consist of "wages and other direct compensation paid to or provided on behalf of the employee," including "health, education, or pension benefits, supplements in lieu of benefits and compensated time off." N.Y. Pub. Health Law § 3614-c(1)(b). The statute is agnostic as to the mix of wages and benefits that employers provide, so long as the total amount equals or exceeds the applicable minimum rate. Where, as here, "a legal requirement may be easily satisfied through means unconnected to ERISA plans . . . it 'affect[s] employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.'" *Burgio*, 107 F.3d at 1009 (quoting *Shaw*, 463 U.S. at 100 n.21).

In the alternative, Plaintiffs argue that the Wage Parity Law makes an impermissible "reference to" an ERISA plan. The Wage Parity Law, they note, sets the "minimum rate" of compensation in New York City based on the "prevailing rate of total compensation as of January [1, 2011]," if that amount is greater than the rate required by the City's Living Wage Law. N.Y. Pub. Health Law § 3614-c(3)(a)(iii). The "prevailing rate of total compensation" is the rate from the largest

25

collective bargaining agreement covering home care aides in New York City, *id.* § 3614-c(1)(c), which as of January 1, 2011 was SEIU 1199's collective bargaining agreement. This agreement establishes and governs several ERISA plans.

Even assuming that such a tenuous link to ERISA plans constitutes a "reference," it does not warrant preemption. "In order to trigger ERISA preemption, a statute must not merely mention or allude to an ERISA plan, but must also have some relationship to ERISA plans or affect ERISA plans in some manner." *Romney v. Lin*, 94 F.3d 74, 79 (2d Cir. 1996) (internal quotation marks and brackets omitted). The Supreme Court has therefore "never found a statute to be preempted simply because the word ERISA (or its equivalent) appears in the text." *NYS Health Maint. Org. Conf. v. Curiale*, 64 F.3d 794, 800 (2d Cir. 1995). Instead, the Court has reserved preemption based on "reference[s] to" ERISA plans for situations where "a State's law acts immediately and exclusively upon ERISA plans . . . , or where the existence of ERISA plans is essential to the law's operation." *Dillingham*, 519 U.S. at 324-25 (citing *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825 (1988); *Dist. of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125 (1992); and *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990)).

The creation of ERISA plans by SEIU 1199's collective bargaining agreement has no more than a remote bearing on the Wage Parity Law's operation. Employers are not required to match the benefits in SEIU 1199's collective bargaining agreement, or to provide benefits at all. Indeed, employers need not even calculate the benefits in SEIU 1199's plan. Instead, the Wage Parity Law requires the Commissioner of the New York State Department of Health to calculate an "hourly amount of total compensation" and promulgate that *rate* to employers. *See* N.Y. Pub. Health Law § 3614-c(1)(c), (8). This calculation converts all of the benefits from SEIU 1199's collective bargaining agreement — including those contained in its ERISA plans — into a single hourly figure. It is that final rate, and not its component parts, that constitutes the "applicable minimum rate of home care aide total compensation." *Id.* § 3614-c(2). The Wage Parity Law would operate in precisely the same way even if SEIU 1199's collective bargaining agreement did not cover ERISA plans at all. The Wage Parity Law, then, "functions irrespective of . . . the existence of an ERISA plan." *Dillingham*, 519 U.S. at 328 (internal quotation marks omitted). Accordingly, the statute's attenuated allusion to such plans does not warrant preemption.

27

## C. Fourteenth Amendment Claims

Finally, the district court concluded that the Wage Parity Law does not violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. We agree.

"[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "Social and economic legislation," like the Wage Parity Law, "that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981). Such laws carry a "presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Id.* at 331-32.

The Wage Parity Law sets the "minimum rate of home care aide total compensation" in both New York City and the surrounding Counties as a percentage of New York City's Living Wage Law. This approach is consistent with the Legislature's goal of providing "high quality home care services to residents of New York state." N.Y. Pub. Health Law § 3600. As the Appellate Division, Third Department, explained:

28

By referring to the New York City statute, the Wage Parity law aims to bring total compensation for Medicaid-reimbursed home care aides in the metropolitan New York area into line with compensation paid to aides who are under contract with New York City, thereby furthering the legislative purpose of stabilizing the workforce, reducing turnover, and enhancing recruitment and retention of home care workers.

*Concerned Home Care Providers*, 969 N.Y.S.2d at 213. The Wage Parity Law therefore easily passes muster under rational basis review.

Plaintiffs counter that, by relying on a rate set by a legislative body outside the surrounding Counties, the Law infringes on the fundamental right to representation in the legislative process and thus warrants strict judicial scrutiny. The Supreme Court has recognized that "citizens have an equal interest in representative democracy, and that the concept of equal protection therefore requires that their votes be given equal weight." *Town of Lockport v. Citizens for Cmty. Action at the Local Level, Inc.*, 430 U.S. 259, 265 (1977); *see also Reynolds v. Sims*, 377 U.S. 533, 565 (1964). But Plaintiffs — five corporations and a not-for-profit trade organization — are not entitled to vote and have no right to equal representation in the legislature. On these facts, the district court correctly refused to subject the Wage Parity Law to strict judicial scrutiny, and we reject Plaintiffs' equal protection challenge.

29

The argument that the Wage Parity Law violates Plaintiffs' rights under the Fourteenth Amendment's Due Process Clause by delegating authority to a private entity — namely, SEIU 1199 — fares no better. "Governmental action may be challenged as a violation of due process only when it may be shown that it deprives a litigant of a property or a liberty interest." *Gen. Elec. Co. v. N.Y. State Dep't of Labor*, 936 F.2d 1448, 1453 (2d Cir. 1991). If a party has a property interest, legislative bodies "may not constitutionally delegate" to private actors "the power to determine the nature of rights to [that] property . . . without supplying standards to guide the private parties' discretion." *Id.* at 1455.

The complaint does not allege that New York is withholding Medicaid funds for services that Plaintiffs have already provided. Instead, Plaintiffs claim a property right in the future "revenues generated by their business." J.A. 24. The Wage Parity Law, however, applies only to the payment of state Medicaid funds, and "[i]t is fundamental that a Medicaid provider has no property interest in or contract right to reimbursement at any specific rate or, for that matter, to continued participation in the Medicaid program at all." *Rye Psych. Hosp. Ctr., Inc. v. New York*, 576 N.Y.S.2d 449, 450 (3d Dep't 1991) (citing *Kaye v. Whalen*, 44 N.Y.2d 754, 755 (1978)); *see also Senape v. Constantino*, 936 F.2d 687, 691 (2d Cir. 1991). Accordingly,

30

Plaintiffs have not adequately pled a violation of their due process rights. *See*

*Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir. 1984).

Moreover, the Wage Parity Law does not delegate decision-making authority to SEIU 1199. The New York Legislature approved the Wage Parity Law on March 31, 2011. Although the statute defines the "prevailing rate of total compensation" in terms of the largest collective bargaining agreement covering home care aides in New York City, only the "prevailing rate of total compensation *as of January [1, 2011]*," sets the minimum rate of total compensation. *See* N.Y. Pub. Health Law § 3614-c(1)(c), (3)(a)(iii). The Legislature therefore selected a particular, preexisting version of the largest collective bargaining agreement in the City. SEIU 1199 has no discretion to make post-hoc alterations to that agreement, and its future collective bargaining efforts have no bearing on the minimum rate of home care aide total compensation. As a result, even if Plaintiffs had a property interest in future Medicaid reimbursements, their due process challenge would fail.

## CONCLUSION

We have considered Plaintiffs' remaining arguments and find them to be without merit. Because we conclude that the Wage Parity Law is not preempted by

the NLRA or by ERISA (setting aside subdivision four), and that the Law is not a violation of Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the judgment of the district court is **AFFIRMED.**